UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


MARK R. FREEMAN,                          CASE NO. 1:06CV00666
      PLAINTIFF                           (DLOTT, J.)
                                          (HOGAN, M.J.)

      VS.

JOANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
      DEFENDANT


## REPORT AND RECOMMENDATION

Plaintiff, who filed his application for benefits in April, 1998, was found to be disabled as of October 15, 1997, and it was also previously determined that Plaintiff's disability ceased as of December 1, 2002. The cessation was upheld on reconsideration. Plaintiff then requested and obtained a hearing before an Administrative Law Judge (ALJ) in Columbus, Ohio in July, 2005. Plaintiff, who was represented by counsel st the hearing, testified as did Vocational Expert, W. Robert Walsh, Ph.D. The ALJ reached an unfavorable result in May, 2006, following which Plaintiff processed an appeal to the Appeals Council. After the Appeals Council denied review in August, 2006, Plaintiff timely filed his Complaint with this Court.


## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ made two errors prejudicial to his case. First, Plaintiff says that the ALJ erred in concluding that Plaintiff's condition had medically improved. The second is that the ALJ erred in attributing less than controlling weight to Plaintiff's treating physicians.


## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that he was 41 years of age and a high school graduate. Plaintiff testified that he lives with his wife and step son in a two-story house in Hillsboro, Ohio. He is 6'2" tall and

weighs 220 lbs. and is right-handed, a licensed automobile driver and a heavy smoker. Plaintiff told the ALJ that he could stand for 4 to 4.5 hours per day, but would need to sit periodically. He estimated that he could sit for 3.5 to 4 hours at a time and lift 20 lbs, but he sometimes loses his balance when he lifts more than 15 lbs.

Prior employment was with Candle Lite, Inc., where he operated a stand-up forklift. Prior employment was at Christopher's as a bartender and at Randall's as a welder. When ask why he cannot work, Plaintiff said that his ankles hurt after standing for more than 1 to 1.5 hours and he needs to stop and take Vicodin. When he gets overheated, his sugar level drops and he experiences "white-outs," the treatment for which is to stop the activity and drink water. He also has difficulty with his balance when walking over rough ground.

When asked about what activities he is able to perform, Plaintiff stated that he is able to do laundry, fish at a pond, visit with his mother and sister, go deer watching, shop, mow the lawn with a riding mower, cook, sweep and vacuum. He awakens at approximately 8:00 and retires at approximately 11:15. Nightly leg cramps interrupt his sleep.

Plaintiff testified that he has lost his big toes on each foot due to diabetes and that burns and bumps or abrasions on his legs take from 8 to 12 weeks to heal. He also testified that he has no feeling in his feet and experience shortness of breath and chest pains due to a reduction in the left wall of the heart. He has cataracts and has had surgery in his left eye. (Tr., Pgs. 474-492A).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The Vocational Expert testified that if the limitations imposed by Dr. Shanahan, Plaintiff's treating physician, were accepted, Plaintiff could not return to his past relevant work, but could perform the light and unskilled jobs of marker, labeler, inspector and assembler, all of which were jobs found in representative numbers in the national economy. The ALJ accepted and adopted the residual functional capacity assessment of Dr. Shanahan.

The Vocational Expert testified that if the limitations imposed by Plaintiff's podiatrist, Dr. Giesy, were accepted, Plaintiff could perform sedentary work. However, the Vocational Expert did not locate any sedentary jobs in the national economy.

If the limitations imposed by Dr. Aina were accepted, Plaintiff could not perform his past

2

relevant work, but could perform a representative number of light and unskilled jobs.

The fourth hypothetical asked the Vocational Expert to assume that Plaintiff's testimony was accurate and credible. The Vocational Expert concluded that if that were so, full-time work would be precluded.

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that as of December 1, 2002, Plaintiff had the medically determinable impairments of diabetes mellitus, diabetic neuropathy, cataracts (left worse than right) and diabetic retinopathy. Obviously, Plaintiff also had suffered the amputation of both big toes due to osteomyelitis. Although the amputations took place on separate dates, both were accomplished prior to March, 1999, the date of another ALJ's determination that Plaintiff was disabled and entitled to benefits. The present ALJ's failure to list the problem with Plaintiff's missing toes as a "medically determinable impairment" as the prior ALJ did is perplexing. In any event, the ALJ found that as of December 1, 2002, Plaintiff did not have an impairment or combination of impairments which met and Listing. The ALJ found that as of December 1, 2002, Plaintiff had the residual functional capacity to lift/carry 20 lbs. occasionally and 10 lbs. frequently, stand/walk a total of 3 hours in an 8-hour day, 30 minutes at a time. The ALJ found that Plaintiff should never climb, balance, stoop, crouch, kneel or crawl. The ALJ further found that Plaintiff should not work at heights nor around moving machinery, and should avoid temperature and environmental extremes, such as dust, fumes and chemicals.

Because the ALJ found that Plaintiff could perform a limited range of light and sedentary work, Plaintiff's disability ceased on December 1, 2002.

## THE MEDICAL RECORD

Plaintiff was diagnosed with insulin dependent diabetes mellitus by Michael Strickland, M.D., Plaintiff's primary care physician, in August, 1997. Dr. Strickland found that Plaintiff suffered from "persistent and recurrent left extremity ulcers." He ordered angiography to assess blood supply and counseled Plaintiff on the relationship between smoking and the risk of limb loss. (Tr., Pg. 85). An abdominal aortogram, performed in August, 1997, at Edena Hospital in

3

Chillicothe, Ohio, showed no abnormalities. (Tr., Pg. 86).

In February, 1998, Plaintiff was examined by Chung Ryu, M.D. at Highland Hospital in Hillsboro, Ohio. Dr. Ryu also diagnosed Plaintiff with diabetes mellitus and reported that he had infected calluses on the bottom of both great toes since July, 1997. In January, 1998, Plaintiff had a procurin treatment and experienced swelling in both legs. A previous arteriogram and ultrasound of both legs showed "chronic deep vein thrombosis." In February, 1998, he had a bone scan of both feet, which showed increased scatter, most marked at the IP joint of the right great toe. In November, 1996, he was hospitalized for right lower leg bone infection. Dr. Ryu debrided and drained the open wound on the bottom of both toes and prescribed an antibiotic. (Tr., Pgs. 90-91).

Plaintiff was admitted in February, 1998, to Highland Hospital in Hillsboro for ulcerated calluses on the bottom of both great toes. The diagnosis was "osteomyelitis of the right great toe with signs of systemic spread." He had been on Cipro, Floxacin and Coumadin. Plaintiff noted that both legs swelled and he developed a low grade fever and pain. X-rays showed a "lytic lesion in the right great toe." He was placed on Augmentin. "He continues to smoke knowing the risk of worsening of his vascular status." Below the knees, he has "the legs of a 70-80 year old." There is "quite a bit of dark pigmentation and scaliness of the skin." (Tr., Pgs. 96-97).

Dr. Strickland consulted Paul Gangl, M.D., an orthopaedic surgeon in February, 1998. Dr. Gangl debrided the ulcers on both feet, prescribed Rocephin and directed Plaintiff to get off of his feet. (Tr., Pgs. 104-105). A bone scan, performed in February, 1998 showed "scattered areas of increased activity, medially at the IP joint of the great right toe." Dr. Roush, who conducted the test, indicated that the results were "compatible with a diagnosis of osteomyelitis."
(Tr., Pg. 111).

In November, 1996, Plaintiff was seen in the emergency room of Highland Hospital with an increased temperature and a non-healing right shin ulcer, which resulted from a burn, the cause of which was coming into contact with a motorcycle tailpipe. Plaintiff was admitted to the hospital for antibiotic therapy and released after a ten-day stay. There was no sign of osteomyelitis at the time. (Tr., Pgs. 115-127). A bone scan of Plaintiff's right tibia and fibula showed no signs of osteomyelitis in November, 1996. (Tr., Pg. 137). A sterile whirlpool treatment was administered by physical therapist, Chris Campbell. (Tr., Pgs. 138-139).

4

In April, 1998, Robert Hummel, M.D. performed a surgical procedure for the debridement of both great toes after previous antibiotic treatment did not succeed in healing open wounds. The cause of Plaintiff's problem was "juvenile onset diabetes." (Tr., Pgs. 142-143).

In May, 1998, after the failure of antibiotics and debridement, the right great toe was amputated by Dr. Hummel at Bethesda North Hospital in Cincinnati. (Tr., Pgs. 145-157).

In June, 1998, Dr. Hummel reported that Plaintiff was a "insulin dependent diabetic with microcirculatory disease in the lower extremities on the basis of angiography and essentially continuous ulcers over the past two years." Treatment consisted of antibiotics, debridement, special shoes, bed rest and platelet derived wound healing factor topically." Osteomyelitis resulted in the amputation of both great toes. Dr. Hummel expressed the opinion that Plaintiff cannot continue to work at a job which requires standing most of the day. (Tr., Pg. 158). Dr. Hummel's opinion in June, 1998, was that Plaintiff should avoid standing, walking, bending, carrying and lifting while standing, but that he could sit. (Tr., Pgs. 160-161).

Myung Cho, M.D. completed a residual functional capacity assessment in November, 1997. Dr. Cho felt that Plaintiff could lift 10 lbs. frequently and 20 lbs. occasionally, sit for 6 hours and stand/walk between 2 and 6 hours per day. His ability to push/pull with the lower extremities was limited. He could occasionally climb a ramp or stairs, but never climb a ladder or scaffold. Dr. Cho agreed that Plaintiff had diabetes mellitus, had lost both great toes, had many ulcerated calluses on the lower extremities, had wound discoloration and dark pigmentation below the knees and had experienced a tingling sensation in both feet. Dr. Cho felt the impairment was severe, but did not meet a Listing. (Tr., Pgs. 162-170).

The pathology report of Plaintiff's amputated left great toe confirmed the earlier diagnosis of osteomyelitis. (Tr., Pgs. 171-172). In September, 1998, Paul Gangl, M.D., an orthopaedic surgeon reported that complications of Plaintiff's diabetes mellitus were diabetic ulcers, osteomyelitis, peripheral neuropathy, amputation of both great toes and Charcot neuropathy of the adjoining toes. Dr. Gangl recommended permanent restriction from prolonged standing, walking, bending, stooping, squatting and crawling. Dr. Gangl restricted his patient from lifting more than 30 lbs. Dr. Gangl amputated Plaintiff's left great toe in July, 1998. (Tr., Pgs. 175-183). Dr. Gangl said that Plaintiff should not stand/walk more than 2.5 hours during a workday, but could perform a sedentary job. (Tr.,

Pgs 188-191).

Dr. Hummel performed a residual functional capacity assessment of Plaintiff in November, 1998. Dr. Hummel also agreed that Plaintiff had diabetes, foot ulcers and neuropathy of the feet. Dr. Hummel opined that Plaintiff should not stand/walk more than ½ hour without interruption and that he should never climb, balance, stoop or crouch. Plaintiff could occasionally kneel or crawl. He should avoid heights, dust and moving machinery. In narrative form, Dr. Hummel expressed that Plaintiff has poor circulation and sensation in his feet and "cannot stand or walk except for short periods." (Tr. Pgs. 185-187).

In June, 1999, Plaintiff presented in the emergency room at Highland Hospital with "out of control diabetes." Mark Davis, M.D. reported that Plaintiff has an insulin pump in his right lower quadrant. He was given saline, Phenergan and insulin. The diagnosis was "acute diabetic ketoacidosis." Dr. Strickland described Plaintiff as "fairly noncompliant" in that he fails to follow a recommended diet, does not monitor his blood sugar in accordance with directions and continues to smoke. (Tr., Pgs. 270-274).

In December, 1999, Plaintiff again presented at the emergency room of Highland Hospital with lethargy and nausea resulting from an insulin deficiency. His blood sugar was brought under control after a 3-hour stay. (Tr., Pg. 295).

In May, 2001, Plaintiff was examined by Catherine Shanahan, M.D. as part of a routine follow-up for diabetes mellitus and hypertension. She again warned him of the dangers associated with smoking. Dr. Shanahan reported that Plaintiff has had diabetes for 11 years and that he uses an insulin pump, which has generally resulted in "better overall health." In December, 2000, Steven Kerner, D.O, observed that the "third toe was oozing and crusting." (Tr., Pgs. 304-311). Dr. Kerner instructed Plaintiff to stop smoking "immediately and completely" because he has "peripheral vascular disease."

Plaintiff was examined in October, 2002 by Olayinka Aina, M.D. Dr. Aina reported that Plaintiff complained only of bilateral ankle pain, made worse by activity and better by rest and pain medication. Dr. Aina reported that "apart from the above, there was nothing contributory in his medical history," although he later indicated that Plaintiff had a past medical history of IDDM, which we will assume refers to insulin dependent diabetes mellitus. Dr. Aina reported that Plaintiff

was able to squat and walk on his heels and toes. Dr. Aina also reported that "Examination of all joints did not show any edema, tenderness or instability." Dr. Aina reported that Plaintiff "should be able to lift, pull, push any amount desired," but "prolonged standing may be affected." X-rays showed a normal right ankle and there was normal range of motion in Plaintiff's knees and ankles. (Tr., Pgs. 325-331).

In November, 2002, Nick Albert, M.D., evaluated Plaintiff. Dr. Albert opined that Plaintiff could lift 100 lbs. or more occasionally and 50 lbs. or more frequently. Dr. Albert estimated that Plaintiff could walk about 6 hours in a workday and sit for the same amount of time. His opinion was that "significant medical improvement has occurred." Dr. Albert found that Plaintiff could frequently climb, balance, stoop, kneel, crouch and crawl. Dr. Albert found "no extremity skin lesions or ulcers or any inflammation." (Tr., Pgs. 332-340). Mila Bacalla, M.D. reviewed Plaintiff's medical file in December, 2002 and found that residual functional capacity assessment provided by Dr. Albert was "not unreasonable." (Tr. Pg. 341). In January, 2003, Edmond Gardner, M.D., found Plaintiff's impairment to be "not severe," (Tr., Pg. 345).

Bryan Giesy, D.P.M., a podiatrist, evaluated Plaintiff in April, 2005. Dr. Giesy indicated that Plaintiff would be "unable to stand or walk for long periods of time" and that doing so would "result in pain, worsening of arthritis, possible ulceration and possible amputation." (Tr., Pgs. 346-348).

Dr. Shanahan did a similar evaluation in April, 2005. Dr. Shanahan said that Plaintiff suffers from "chronic pain and swelling in ankles due to mechanical deformity, complicated by diabetic related neuropathy and peripheral vascular disease." She said that he could lift 10 lbs. frequently and 20 lbs. occasionally. She estimated that Plaintiff could walk for 3 hours in a workday and no more than ½ hour at a time. She felt that sitting was unaffected, but that Plaintiff should never climb, balance, stoop, crouch, kneel or crawl. He should avoid exposure to environmental irritants. Dr. Shanahan concluded by writing that "Mark has diabetes mellitus, complicated by cataracts, heart disease, peripheral neuropathy, bilateral foot deformity and autonomic dysfunction. All of these leave him very vulnerable and intolerant to stresses related to routine work." (Tr., Pgs. 349-352).

X-rays of Plaintiff's right ankle in October, 2002, showed "no bony or soft tissue abnormality." Because of chest pain and an abnormal stress test, Plaintiff presented for angiography in March, 2003. The coronary anteriogram was normal. (Tr., Pgs. 353-355).

7

Plaintiff saw Louis Schott, M.D., an ophthalmologist, in April, 2003 because of "decreased vision in both eyes." Dr. Schott found that Plaintiff had cataracts in both eyes, but that the left was worse than the right. He recommended cataract extraction and a lens implant for the left eye. (Tr., Pg. 356).

In January, 2004, Plaintiff consulted Lester Suna, M.D., John Held, M.D. and David Babbitt, cardiologists for "chest tightness and dyspnea on exertion." Lower extremity arterial evaluation showed "no evidence of lower arterial obstruction, but a mild calcific process in the cathed arteries. He has a history of insulin dependent diabetes. hypertension and is a heavy smoker." (Tr., Pgs. 357-361).

Plaintiff saw Dr. Giesy in March, 2005, on a referral from Dr. Shanahan for feet instability. Dr. Giesy described Plaintiff as a "long-standing diabetic with neuropathy and previous amputation of both big toes. He also suffers from PVD [peripheral vascular disease]." Dr. Giesy described Plaintiff's gait as "antalgic" (tending to alleviate pain). Dr. Giesy felt that surgery would not be advisable because of Plaintiff's diabetes and a brace would be ineffective because of his deformity was rigid and non-reduceable. Plaintiff accepted Dr. Giesy's opinion and resolved to "do the best he can" with the present state of his medical situation. (Tr., Pg. 390).

In October, 2003, Dr. Shanahan's office note indicated that Plaintiff was "noncompliant with diet" (Tr., Pg. 415) and in January, 2004, her office note indicated that Plaintiff "continues to smoke." (Tr., Pg. 406). In May, 2005, Dr. Shanahan again emphasized the importance of diet, exercise and the negative effect of smoking." (Tr., Pg. 416). These references to noncompliant behavior continue throughout Dr. Shanahan's office notes. In June, 2005, she wrote a prescription for diabetic shoes. (Tr., Pg. 450).

In November, 2001, Dr. Kerner indicated that Plaintiff was "doing well with his insulin pump" and "on Monopril and Lipitor." Distal pulse in the extremities was "slightly diminished." There was some "hypopigmentary changes," but "no definite evidence of infection." His hypertension was "well-controlled," but there was "ongoing tobacco abuse." (Tr., Pg. 461).

Dr. Shanahan reported in May, 2005 that Plaintiff was seen for a routine checkup for control of diabetes and hypertension. She reported that his diabetes was under "reasonable control, but suboptimal." She reported that his hypertension was under "excellent control" with Monopril. She recommended an eye exam and again instructed Plaintiff to quit smoking. (Tr., Pg. 463).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

In determining whether disability has ceased, the Commissioner must consider the following steps:

(1) Is the beneficiary working? If so (and there is no issue of a trial work period), the beneficiary is no longer disabled.

(2) If a beneficiary is not working, do his or her impairments meet or equal a Listed Impairment? If so, the beneficiary is still disabled.

(3) If the beneficiary's impairments do not meet or equal a Listing, has there been any medical improvement? If so, then the analysis proceeds to step four. If not, the analysis proceeds to step five.

(4) Is the medical improvement related to the beneficiary's ability to work? If so, the analysis proceeds to step six. If not, the analysis proceeds to step five.

(5) If there has been no medical improvement, or if the medical improvement is not related to

the beneficiary's ability to work, does one of the exceptions to medical improvement listed in 20 C.F.R. § 1594 (d) or (e) apply? If not, disability continues. If an exception in § 1594 (d) applies, the analysis proceeds to step six. If an exception in § 1594 (e) applies, the beneficiary is no longer disabled.

(6) If medical improvement is related to the ability to work, are all current impairments severe in combination? If not, then the beneficiary is no longer disabled.

(7) If the impairments are severe, the Commissioner determines the beneficiary's residual functional capacity (RFC) and considers whether the beneficiary can do his or her past work. If so, the beneficiary is no longer disabled.

(8) If the beneficiary cannot do his or her past work, the Commissioner decides whether the beneficiary can do other work given his or her RFC, age, education, and work experience. If the beneficiary can, he or she is no longer disabled. If not, disability continues.

20 C.F.R. § 404.1594 (f).

"In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to

10

controlling weight. 20 C.F.R. § 1527(d)(2); *see also Walters*, 127 F.3d at 530. If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). The opinion of a non-examining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physicians. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). If the ALJ rejects a treating physician's opinion, the ALJ's decision must be supported by a sufficient basis which is set forth in his decision. *Walter v. Commissioner*, 127 F.3d 525, 529 (6th Cir. 1997); *Shelman*, 821 F.2d at 321.

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

## OPINION

Plaintiff asserts that his medical condition did not improve to the point that he is no longer disabled. Defendant, of course, disagrees as did the ALJ. Plaintiff has succeeded in pointing out the flaws in the examination done by Dr. Aina. Plaintiff testified on record before the ALJ and made no reference to the nature of his complaints to Dr. Aina at the time of his examination in October, 2002, nor did counsel examine him on that issue, but Plaintiff did testify that Dr. Aina never examined his feet and the record evidence would support that fact. Dr. Aina reported that

11

Plaintiff complained only of bilateral ankle pain. There is nothing of record to rebut that point. However, Dr. Aina reported that apart from Plaintiff's complaint of bilateral ankle pain, there was nothing contributory in his medical history. Since Dr. Aina acknowledged that Plaintiff had insulin dependent diabetes mellitus, we assume that Dr. Aina meant that his diabetic condition did not contribute to his ankle pain. Dr. Aina also mentioned that his examination of all joints did not show any evidence of swelling, tenderness or instability. This comment may literally be true, since Plaintiff had no great toe on either foot because of previous amputations. That one with missing great toes would experience at least some degree of instability would seem quite logical. That Dr. Aina would not even mention that both great toes had been amputated seems incredulous and supports Plaintiff's assertion that the doctor did not examine his feet.

In any event, although Dr. Aina's examination was superficial, the real question is how much of an effect did the report of the examination results have on the ALJ. The only citation to Dr. Aina in the ALJ's decision was one sentence where she says that she accepts the opinion of Dr. Shanahan, Plaintiff's primary care physician and finds Dr. Shanahan's opinion to be consistent with that of Dr. Aina. The writer cannot conceive how these opinions are consistent.

Dr. Shanahan's opinion, contained at Exhibit 10F, not 11F as stated in the opinion, states that Plaintiff has "chronic pain and swelling in ankles due to mechanical deformity, complicated by diabetic related neuropathy and peripheral vascular disease. Dr. Shanahan placed a 20 lb. limitation upon occasional lifting and a 10 lb. limitation upon occasional lifting. Dr. Shanahan indicated that standing/walking were affected by Plaintiff's impairment and that he should not stand/walk more than 3 hours in a workday and should take a break every ½ hour. He should never climb, balance, stoop, crouch, kneel or crawl and should be restricted from heights, moving machinery, chemicals, temperature extremes and dust, fumes and humidity. Dr. Shanahan never expressed the opinion that Plaintiff could not work. She said that because of all of Plaintiff's impairments, he would be "vulnerable and intolerant to stressors related to routine work."

Dr. Aina, on the other hand, felt that Plaintiff "should be able to lift, pull and push any amount desired" and that "there should be no restrictions." Both Drs. Shanahan and Aina agreed that sitting was unaffected.

Despite the fact that the opinions of Drs. Aina and Shanahan are at odds and cannot be

12

reconciled as consistent, the ALJ did adopt the residual functional capacity assessment of Dr. Shanahan and incorporated the restrictions and limitations contained therein into the hypothetical question put to the Vocational Expert, who located a number of jobs Plaintiff could perform at the light and sedentary exertional levels. The Vocational Expert also testified that if Dr. Aina's opinion was accepted, Plaintiff could also perform a number of additional jobs. To that extent, the two opinions are consistent, although they differ widely in the scope of restrictions imposed by the respective evaluators. The point is that when one's treating physician is the architect of the restrictions accepted by the ALJ in formulating her hypothetical question, one would be hard pressed to argue the prejudicial effect of such a decision.

Dr. Shanahan thought that a podiatrist might be of assistance to Plaintiff, so she referred him to Dr. Giesy, who examined Plaintiff and concluded that neither surgery nor a brace would be beneficial. Dr. Giesy agreed with Drs. Aina and Shanahan that Plaintiff's impairment was unaffected by sitting. He also agreed with Dr. Shanahan that prolonged standing with the weight of the body resting upon the feet was a really bad idea, and even Dr. Aina conceded that prolonged standing may affect Plaintiff in a negative manner. The ALJ accommodated Plaintiff's inability to stand for long periods by adopting Plaintiff's primary care doctor's opinion on the matter. Since Dr. Giesy voiced no opinion on the subject and the opinions of Drs. Albert and Aina were much less restrictive, the ALJ adopted the opinion of Dr. Shanahan, which was more similar to the view expressed by Dr. Hummel. The ALJ's ultimate conclusion regarding Plaintiff's ability to stand/walk and sit was very much in line with the bulk of the medical evidence. The sole view to the contrary came from Plaintiff himself, whose statement of inability to perform any work was contradicted by the things he was able to do, such as fish, play pool and shovel snow.

That Plaintiff still has diabetes, peripheral neuropathy and peripheral vascular disease is quite obvious. That he has medically improved is equally obvious. Since the amputation of his great toes and the use of an insulin pump, he has experienced minimal ulceration on the legs and no longer needs crutches to ambulate. Whether or not he is as stable walking as he was prior to the amputation is unresolved. Despite Dr. Aina's comments to the contrary, we are quite sure that great toes have a stabilizing effect when one walks and changes direction and speed. On the other

hand, the stabilizing effect of ulcerated and obviously painful great toes is questionable. The net result of this inquiry is that Plaintiff had stability issues before the amputations and he still has them. All the record shows is that Plaintiff is able to walk unassisted by mechanical devices and this fact shows medical improvement.

When Plaintiff was declared eligible for benefits in March, 1999, he was unable to stand/walk except for a few minutes at a time. He experienced multiple ulcers and infections which took months to resolve. Now he has minimal ulceration and no infections of any significance. While he was once confined to a wheelchair and to the use of crutches, he is now able to walk without assistance and was able to walk heel to toe for Dr. Aina. While one might question the ALJ's conclusion that Plaintiff can perform the requirements of light work, simply because it's a long way from being unable to perform even sedentary work, the ALJ's conclusion in this respect was supported by Plaintiff's primary care physician and Plaintiff is a relatively young man and not a small person.

Lastly, and to the extent that Plaintiff argues that his doctors were attributed less than controlling weight, we strongly disagree. The ALJ followed the recommendations of Drs. Shanahan and Giesy and incorporated their findings into her residual functional capacity assessment, rather than put much credence upon the opinions of Drs. Albert and Aina.

**IT IS THEREFORE RECOMMENDED THAT** the decision of the ALJ be affirmed and that this case be dismissed from the docket of the court.

March 31, 2008

Timothy S. Hogan
United States Magistrate Judge

14

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MARK R. FREEMAN,                                        CASE NO. 1:06CV00666
           **PLAINTIFF**                                        (DLOTT, J.)
                                         (HOGAN, M.J.)

      VS.

JOANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
           **DEFENDANT**


## NOTICE

      Attached hereto is the Report and Recommended Decision of the Honorable Timothy S. Hogan, United States Magistrate Judge, which was filed on 3/31/08 . Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).